FILED

May 24 2022

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY        s/ AlexandraS        DEPUTY

Unsealed on 8/9/22 - dlg

# SEALED

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

July 2021 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>  v.<br><br>KARIM ARABI (1),<br>SHEIDA ALAN (2),<br>   aka Sheida Arabi,<br>SANJIV TANEJA (3),<br>ALI AKBAR SHOKOUHI (4),<br><br>        Defendants. | Case No. '22 CR1152 W<br><br>I N D I C T M E N T<br><br>Title 18, U.S.C., Sec. 1349 – Wire Fraud Conspiracy; Title 18, U.S.C., Sec. 1343 – Wire Fraud; Title 18, U.S.C., Sec. 1956(h) – Conspiracy to Launder Monetary Instruments; Title 18, U.S.C., Sec. 1957 – Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity; Title 18, U.S.C., Secs. 981(a)(1)(C), 982(a)(1), and 982(b), and Title 28, U.S.C., Sec. 2461(c) – Criminal Forfeiture |

The grand jury charges, at all relevant times:

## Introductory Allegations

1.  Defendant KARIM ARABI ("KARIM") was an engineer working in the technology industry and specializing in the "Design for Test" (or "DFT") field of the microchip sector. Defendant KARIM was employed by Victim Company as a Vice President of Engineering from 2007 to 2012 and as a Vice President of Research and Development from 2013 to 2016.  As a Victim Company employee, defendant KARIM was bound by agreements

NKP:cms:San Diego/Imperial:5/23/22

generally providing that intellectual property he created during his period of employment would belong to Victim Company.

2.   Defendant SHEIDA ALAN, aka Sheida Arabi, ("SHEIDA") was KARIM's younger sister, residing in Vancouver, British Columbia, Canada. From 2014 to 2016, defendant SHEIDA pursued a master's degree at University 1 in British Columbia, Canada, where she studied under a professor (Individual 1) to whom defendant KARIM had introduced her. At all times material to this indictment, defendant SHEIDA's studies related to subjects generally relevant to inkjet printing and not to the DFT field.

3.   Defendant SANJIV TANEJA was a technology executive whom defendant KARIM hand-picked to serve as Chief Executive Officer ("CEO") of Abreezio, LLC ("Abreezio"). Following Victim Company's acquisition of Abreezio, defendant TANEJA was briefly employed at Victim Company from approximately October 2015 to May 2016.

4.   Defendant ALI AKBAR SHOKOUHI was an entrepreneur, investor, and business advisor.  He was employed at Victim Company as a Vice President of Engineering from approximately 2011 to 2014.  Defendant SHOKOUHI funded Abreezio's initial development through entities that defendant SHOKOUHI controlled, including Company 1 and Company 2. Defendant SHOKOUHI also arranged to provide clerical and financial services support to Abreezio through Company 1, whose staff provided financial services to Abreezio.  Defendant SHOKOUHI also controlled Company 3, which provided additional support to Abreezio during its formation and development.

5.   Abreezio was a newly-formed technology startup company based in Sunnyvale, California. Defendants KARIM, TANEJA, SHOKOUHI and others created Abreezio as a vehicle to commercialize new DFT technology

provisionally patented by defendant KARIM while he worked for Victim Company. Even though defendant KARIM was intimately involved in Abreezio's formation and development, defendant KARIM never disclosed his DFT technology or the patents to Victim Company, and indeed Abreezio's principals, including defendant TANEJA, concealed defendant KARIM's connections with Abreezio from Victim Company throughout the marketing and due diligence processes leading to Abreezio's sale to Victim Company.

6. Victim Company was a large multinational technology company based in San Diego, California. Among other things, Victim Company specialized in microchip design, testing, and optimization, and therefore stood to benefit substantially from incremental improvements in the DFT field.

7. Company 1 was a technology services company controlled by defendant SHOKOUHI and others, based in San Diego, California.

8. Company 2 was a technology investment company controlled by defendant SHOKOUHI and others, based in San Diego, California.

9. Company 3 was a technology staffing and services company controlled by defendant SHOKOUHI and others, based in San Diego, California.

10. Company 4 was a Canadian technology services company, based in British Columbia, Canada. Company 4 was controlled by Individual 2, who was defendant KARIM's former colleague.

11. On October 30, 2015, Victim Company finalized a deal to purchase Abreezio and its DFT technology for approximately $150 million. As part of the purchase price, Victim Company paid over $91 million to defendant SHEIDA, over $10 million to defendant TANEJA, and over $24

3

million combined to Company 2 and Company 3, which were controlled by
defendant SHOKOUHI.

### Count 1

### Wire Fraud Conspiracy

### 18 U.S.C. § 1349

### [All Defendants]

12.  The foregoing paragraphs are hereby incorporated by reference
as if fully stated herein.

13.  Beginning no later than October 2014, and continuing up to at
least June 2018, within the Southern District of California and
elsewhere, defendants KARIM ARABI ("KARIM"), SHEIDA ALAN, aka Sheida
Arabi, ("SHEIDA"), SANJIV TANEJA, and ALI AKBAR SHOKOUHI knowingly and
intentionally conspired with each other and others known and unknown to
the grand jury, to commit wire fraud, that is to knowingly devise a
material scheme and artifice to defraud and to obtain money and property
by means of materially false and fraudulent pretenses, representations,
and promises, and by intentional concealment and omission of material
facts, and in executing said scheme, caused writings, signs, signals,
and sounds to be transmitted by means of wire in interstate commerce;
in violation of Title 18, United States Code, Section 1343.

14.  It was the purpose of the conspiracy that defendants KARIM,
SHEIDA, TANEJA, and SHOKOUHI would and did fraudulently obtain tens of
millions of dollars from Victim Company by selling it valuable DFT
technology nominally owned by new technology start-up Abreezio, LLC
("Abreezio") while concealing from Victim Company that the technology
had been provisionally patented by defendant KARIM, and originally
developed by and in close association with defendant KARIM, who was then
a Victim Company employee, and also to conceal from Victim Company the

4

role of defendant SHOKOUHI and one of defendant SHOKOUHI's companies (Company 1) in Abreezio's funding and development.

15.   To execute the scheme, defendants KARIM, SHEIDA, TANEJA, and SHOKOUHI used the following manner and means, among others:

a.   It was a part of the conspiracy that defendant KARIM would and did file and cause to be filed provisional patents for Abreezio's core DFT technology, falsely listing defendant SHEIDA as its true inventor while concealing his own primary role;

b.   It was a further part of the conspiracy that defendant SHEIDA would and did attempt to assist defendant KARIM in the patent filing process, despite knowing that she had no real connection to the technology being patented as her supposed invention;

c.   It was a further part of the conspiracy that defendants KARIM and TANEJA would and did create, and defendant KARIM would and did use, multiple email accounts containing defendant SHEIDA's name so that defendant KARIM could impersonate defendant SHEIDA and send emails purporting to be her;

d.   It was a further part of the conspiracy that defendant TANEJA would and did send deceptive emails nominally to defendant SHEIDA but in truth to email accounts controlled and used by defendant KARIM, as defendant TANEJA well knew, to make it appear that defendant SHEIDA was an active participant in Abreezio's formation and development;

e.   It was a further part of the conspiracy that defendant KARIM would respond to these emails, signing email messages as defendant SHEIDA and occasionally forwarding documents supposedly signed by defendant SHEIDA, all in an effort to falsely portray defendant SHEIDA as an active participant in Abreezio's formation and development;

1          f.   It was a further part of the conspiracy that defendant
2   KARIM would and did plan with his former colleague, Individual 2, to use
3   a third-party holding company (later transitioned to Abreezio) as a
4   vehicle for the intellectual property rights to defendant KARIM's new
5   DFT technology, specifically in order to market it to Victim Company;

6          g.   It was a further part of the conspiracy that defendant
7   KARIM would and did engage Individual 2's technology development company
8   (Company 4) to further refine and monetize the DFT technology before
9   marketing it to Victim Company, and would select Individual 2 to serve
10  as Abreezio's Chief Technology Officer;

11         h.   It was a further part of the conspiracy that defendant
12  KARIM would and did plan with Individual 2 to put Individual 1, defendant
13  SHEIDA's advisor and professor at University 1, on Abreezio's board of
14  directors to lend it credibility as a legitimate independent firm;

15         i.   It was a further part of the conspiracy that defendant
16  KARIM would and did select Abreezio's business name and recruit and
17  retain defendant TANEJA as Abreezio's CEO, while planning with defendant
18  TANEJA to hide defendant KARIM's role in Abreezio from Victim Company
19  and falsely portray to Victim Company that Abreezio's core technology
20  was defendant SHEIDA's invention;

21         j.   It was a further part of the conspiracy that defendants
22  TANEJA, SHOKOUHI and KARIM, and others, would and did attend regular
23  operations meetings to discuss the formation and development of Abreezio
24  without involving defendant SHEIDA in any way;

25         k.   It was a further part of the conspiracy that defendants
26  TANEJA, SHOKOUHI and KARIM would and did regularly refer to defendant
27  KARIM as "Sheida" in connection with planning meetings and calls in
28  order to mask defendant KARIM's role in the formation and development

of Abreezio, and to falsely portray defendant SHEIDA as involved in that process;

l.    It was a further part of the conspiracy that defendant KARIM would and did provide defendant TANEJA with sensitive internal information about Victim Company's existing DFT technology, which Abreezio's DFT technology would replace or supplant, in order to fine-tune Abreezio's marketing pitch;

m.    It was a further part of the conspiracy that defendant KARIM would and did provide feedback to defendant TANEJA about Abreezio's marketing materials and about specific persons at Victim Company to contact as part of Abreezio's pitch, writing from an email account purportedly used by defendant SHEIDA and which defendant KARIM in truth used to impersonate her;

n.    It was a further part of the conspiracy that defendant SHOKOUHI would and did provide seed funding and staff support to Abreezio from other companies that defendant SHOKOUHI controlled, including Company 1, Company 2, and Company 3;

o.    It was a further part of the conspiracy that defendants SHOKOUHI, TANEJA and KARIM, and others, would and did conceal or minimize the role of both defendant SHOKOUHI and Company 1 in Abreezio's formation and development to avoid scrutiny from Victim Company's due diligence staff, in part because Victim Company had flagged conflict of interest issues with defendant SHOKOUHI and Company 1 roughly a year earlier; for example, Company 1 would route its funding through Company 2 to obscure Company 1's involvement in Abreezio;

p.    It was a further part of the conspiracy that defendant SHEIDA would and did legally change her name from "Sheida Arabi" to

1  "Sheida Alan" as part of the scheme in order to further mask her
2  connection with defendant KARIM;

3          q.   It was a further part of the conspiracy that defendant
4  KARIM would and did alter copies of patent documents to remove original
5  references to "Sheida Arabi" and replace them with references to "Sheida
6  Alan" following defendant SHEIDA's legal name change, all in an effort
7  to further conceal defendant KARIM's connection to defendant SHEIDA and
8  Abreezio;

9          r.   It was a further part of the conspiracy that defendant
10 TANEJA would and did prepare backdated patent assignment documents to
11 make it appear that defendant SHEIDA had signed them months earlier, and
12 would and did provide signed, backdated documents to Victim Company;

13         s.   It was a further part of the conspiracy that defendants
14 TANEJA, SHOKOUHI, and KARIM would and did coordinate responses to
15 questions asked during Victim Company's due diligence inquiries to hide
16 the role of defendant KARIM, defendant SHOKOUHI and Company 1 in
17 Abreezio's formation, funding and development;

18         t.   It was a further part of the conspiracy that defendant
19 SHEIDA would and did sign a notarized patent assignment agreement for
20 the patent to Abreezio's core technology, knowing that she had no real
21 connection to the technology being represented as her supposed
22 invention;

23         u.   It was a further part of the conspiracy that defendants
24 TANEJA, SHEIDA, and others would and did misrepresent to Victim Company
25 in documents for its purchase of Abreezio that Abreezio was the sole and
26 exclusive owner of its technology, and that everyone involved in the
27 creation and development of Abreezio's intellectual property had been
28 truthfully disclosed, all while knowing and concealing that defendant

8

1  KARIM was intimately involved in that process, which would have allowed
2  Victim Company to assert its own claim to Abreezio's intellectual
3  property, had it known the truth;

4  v.   It was a further part of the conspiracy that defendants
5  SHEIDA and KARIM would and did cause the preparation and submission of
6  false and misleading discovery responses in civil litigation brought
7  against them by Victim Company following the Abreezio sale; and

8  w.   It was a further part of the conspiracy that defendants
9  KARIM and SHEIDA would and did prepare and cause to be prepared a
10  falsified handwritten notebook purportedly documenting SHEIDA's
11  contemporaneous research notes concerning DFT technology, and cause
12  copies of the notebook to be produced in discovery in civil litigation
13  brought by Victim Company.

14  16.   In further of this scheme, defendants KARIM, SHEIDA, TANEJA,
15  and SHOKOUHI committed the following overt acts, among others:

16  a.   On or about October 20, 2014, defendant KARIM's former
17  colleague, Individual 2, emailed defendant KARIM to discuss their joint
18  plan to use a dormant outside company (the "Holding Company") to develop
19  defendant KARIM's technology and market it to "large semiconductor
20  companies like [Victim Company]"; according to the email, part of the
21  arrangement would involve making defendant KARIM or one of his family
22  members significant shareholders in the Holding Company;

23  b.   On or about December 2, 2014, Individual 2 emailed
24  defendant KARIM to discuss the corporate structure of the Holding
25  Company; Individual 2 emphasized the need to think about "the appearance
26  of control from an investor/acquirer due diligence point of view," adding
27  that "[an] independent investor, with [] even a small i[n]vestment, who
28  could take a board role, would be very helpful" for this purpose;

9

c.   On or about December 9, 2014, defendant KARIM emailed Individual 2 and suggested Individual 1 for a board seat on the Holding Company, adding that Individual 1 was supervising defendant SHEIDA in her graduate studies; in response, Individual 2 cautioned defendant KARIM against having defendant SHEIDA work on related technology at University 1 because University 1 might try to assert intellectual property rights in SHEIDA's work;

d.   On or about December 15, 2014, using a San Diego-based IP address, defendant KARIM caused to be submitted an "Info Sheet" for a provisional patent for technology related to the DFT field listing "Sheida Arabi" as the purported sole inventor and main contact, but bearing defendant KARIM's personal email address and defendant KARIM's telephone number as defendant SHEIDA's contact information;

e.   On or about December 17, 2014, defendant KARIM created a Google email account ("sheida.arabi1@gmail.com") for the purpose of impersonating defendant SHEIDA (the "First SHEIDA Sham Account"); defendant KARIM created the First SHEIDA Sham Account from the same San Diego-based IP address that he had used to submit the "Info Sheet" for the provisional patent on December 15, 2014;

f.   In approximately December 2014, using one of her personal email accounts, defendant SHEIDA forwarded to defendant KARIM several emails associated with the provisional patent registration process, seeking defendant KARIM's guidance to facilitate the filings under defendant SHEIDA's name even though she had no real connection to the technology being patented as her supposed invention; in one email, defendant SHEIDA wrote to defendant KARIM, "What I need to send ??? I don not [sic] have any idea";

1      g.    On or about December 22, 2014, defendant KARIM caused to
2  be filed a provisional patent application for DFT technology with the
3  U.S. Patent and Trademark Office ("USPTO"); the application identified
4  "Sheida Arabi" as the inventor, applicant, and filer, and provided the
5  First SHEIDA Sham Account as defendant SHEIDA's supposed email contact;

6      h.    On or about December 28, 2014, defendant KARIM caused to
7  be filed a second provisional patent application for related DFT
8  technology to the USPTO, identifying "Sheida Arabi" as the inventor, and
9  providing the First SHEIDA Sham Account as defendant SHEIDA's supposed
10 email contact;

11     i.    On or about January 21, 2015, defendant KARIM emailed
12 Individual 2 to inform him that defendant KARIM was close to finalizing
13 an agreement with defendant TANEJA for defendant TANEJA to serve as CEO
14 of the Holding Company;

15     j.    On or about January 23, 2015, defendant SHOKOUHI emailed
16 defendants KARIM and TANEJA to invite them and Individual 2 to an
17 operations meeting to discuss the formation and organization of the
18 Holding Company, including plans to engage with Victim Company (and
19 other customers); defendant KARIM replied to confirm the time for the
20 first telephone meeting, copying Individual 2 at defendant SHOKOUHI's
21 request; defendant SHEIDA was not invited or even copied on either
22 message;

23     k.    On or about January 29, 2015, defendant KARIM emailed
24 defendants TANEJA and SHOKOUHI and Individual 2 to suggest a series of
25 names for the Holding Company, including Abreezio, which was eventually
26 selected; defendant SHEIDA was not copied;

27     l.    On or about February 3, 2015, after arranging to set up
28 Abreezio  email  accounts  for  himself,  defendant  SHOKOUHI,  and

Individual 2, defendant TANEJA texted defendant KARIM that he was "[a]ssuming you will continue to use your Hotmail (better for O reasons)," clarifying a moment later "O – optics";

    m.   On or about February 3, 2015, defendant TANEJA arranged to set up an Abreezio email account nominally for defendant SHEIDA ("sheida@abreezio.com") (the "SHEIDA Abreezio Account") but sent the activation instructions to the First SHEIDA Sham Account and texted defendant KARIM to alert him that defendant TANEJA was setting up an account "for your sister";

    n.   Shortly thereafter, on or about February 3, 2015, defendant KARIM texted defendant TANEJA "Just activated the google account. It shows Verification in progress";

    o.   On or about February 24, 2015, defendant TANEJA emailed Individual 3, who was then a high-level employee at Victim Company and was in fact defendant KARIM's former supervisor, to introduce Abreezio; defendant TANEJA described Abreezio as "an angel-funded Silicon Valley based design IP start-up" and requested a meeting to showcase its "groundbreaking technology";

    p.   On or about February 25, 2015, defendant TANEJA texted defendant KARIM asking for help to prepare the "quantifiable benefit" portion of Abreezio's presentation to Victim Company; specifically, defendant TANEJA asked defendant KARIM for the "numbers" for the comparable technology that Victim Company was then using, so that the Abreezio team would know "the 'threshold' we need to cross at [Victim Company]" which would "help us calibrate our positioning going in";

    q.   On or about March 3, 2015, defendant KARIM provided feedback on Abreezio marketing material circulated by defendant TANEJA, using the First SHEIDA Sham Account;

r.   On or about March 4, 2015, defendant TANEJA and Individual 2 made a formal pitch on behalf of Abreezio to Victim Company staff;

s.   On or about March 11 and March 13, 2015, defendant TANEJA emailed copies of Abreezio's operating agreement to the First SHEIDA Sham Account and the SHEIDA Abreezio Account; on or about March 13, 2015, defendant TANEJA texted defendant KARIM "couple of updates in Inbox. Thanks!";

t.   On or about March 12, 2015; September 21, 2015; October 5, 2015; and October 13, 2015, defendant SHOKOUHI caused Company 1 to provide hundreds of thousands of dollars of funding to Abreezio, in each case funneling the money through Company 2 to obscure its true source from Company 1;

u.   On or about March 20, 2015, defendant TANEJA made another formal pitch on behalf of Abreezio to Victim Company staff, including Individual 3 (KARIM's former supervisor); later that evening, defendant TANEJA texted defendant KARIM "Thanks again to your technical prowess 'genius,' creative innovation and guidance, we made [a] great impression yesterday!"; to keep up the false appearance that Abreezio's technology was really invented by defendant SHEIDA, defendant KARIM responded, "Thanks Sanjiv! I am quite proud of my sister and what she has accomplished.";

v.   On or about May 27, 2015, defendant TANEJA emailed defendant SHOKOUHI, Individual 2, and the SHEIDA Abreezio Account with subject "call-in number for our 5pm call" and dial-in information for a conference call; the SHEIDA Abreezio Account replied "Will call in a few minutes"; at 5:12 p.m., defendant KARIM called the dial-in number listed

13

in defendant TANEJA's email from defendant KARIM's personal telephone number;

w.   On or about July 15, 2015, defendant SHEIDA legally changed her name from "Sheida Arabi" to "Sheida Alan" with British Columbia authorities in Canada, in part to further enable Abreezio and its principals to disguise from Victim Company any connection between Abreezio and defendant KARIM;

x.   On or about September 19, 2015, defendant KARIM created a second Google account ("sheida.alan@gmail.com") for the purpose of impersonating SHEIDA (the "Second SHEIDA Sham Account") and to avoid use of SHEIDA's original surname "Arabi" in order to further distance defendant KARIM from Abreezio; defendant KARIM created the Second SHEIDA Sham Account from the same San Diego-based IP address that he had used to create the First SHEIDA Sham Account on December 17, 2014, and to submit the "Info Sheet" for the provisional patent on December 15, 2014;

y.   On or about September 21, 2015, the Second SHEIDA Sham Account emailed defendant TANEJA altered versions of the provisional patent applications that defendant KARIM had submitted in December 2014, which had been doctored to remove a reference to "Sheida Arabi" and replace it with "Sheida Alan," and to remove the reference to the First SHEIDA Sham Account and replace it with the Second SHEIDA Sham Account;

z.   On or about September 23, 2015, defendant TANEJA emailed defendant SHOKOUHI to suggest creating an Abreezio email account for Individual 4, a key employee of Company 1 who had been providing financial support to Abreezio; in order to continue to conceal Company 1's role in Abreezio's development, defendant SHOKOUHI emailed that "We can't use [Individual 4's] name since [Victim Company] knows

she works for [Company 1]. She talk[s] to [Victim Company] on regular bas[i]s";

aa.  On or about September 24, 2015, defendant TANEJA emailed the Second SHEIDA Sham Account to ask "Sheida" to sign a patent assignment agreement which had been backdated to February 17, 2015, over the name "Sheida Alan"; later that evening, the Second SHEIDA Sham Account responded, attaching a backdated signed patent assignment agreement bearing the signature "Sheida" (with no last name) over the typed signature line "Sheida Alan";

bb.  On or about October 19, 2015, in response to a question from Victim Company's due diligence staff about Company 2's ownership and its connections to Abreezio's management or staff, defendant TANEJA replied (after consultation with the Second SHEIDA Sham Account) that Company 2 was "a bunch of private money including [an Abreezio board member] and his friends from [other named companies]," assuring Victim Company that there was no connection between Company 2 and any of Abreezio's employees or management; in the email, defendant TANEJA did not mention any connection between Company 2 and either defendant SHOKOUHI or Company 1;

cc.  On or about October 26, 2015, defendant SHEIDA signed a notarized patent assignment agreement concerning the Abreezio DFT technology patents in Burnaby, British Columbia, Canada, using the name "Sheida Alan";

dd.  On or about October 26, 2015, the Second SHEIDA Sham Account sent a fictitious resumé for defendant SHEIDA to defendant TANEJA, which contained numerous false statements about defendant SHEIDA's qualifications, including invented work and academic history both relevant to DFT technology; in the cover email for the fictitious

resumé, "Sheida" further stated that she had not signed any assignments of intellectual property rights with University 1 as part of her graduate work;

ee.  On or about October 30, 2015, defendants TANEJA and SHEIDA and others signed a Unit Purchase Agreement for Victim Company's purchase of Abreezio, in which they falsely represented that they had made no intentional misrepresentations in connection with the relevant patent applications, and that Abreezio had not misrepresented or failed to disclose any facts in any application that would constitute fraud or an intentional misrepresentation with respect to such an application; defendants TANEJA and SHEIDA and others also represented in the agreement that they had truthfully disclosed everyone involved in the conception, creation, and development of Abreezio's intellectual property, even though nowhere in the process did anyone disclose defendant KARIM's involvement;

ff.  On or about October 30, 2015, defendants KARIM, SHEIDA, TANEJA and SHOKOUHI caused Victim Company to issue a combination of wire transfers totaling over $150 million (USD) to themselves, their associates, and entities that they controlled, in exchange for Victim Company's purchase of Abreezio;

gg.  On or about November 1, 2015, in a further effort to create a fake paper trail substantiating defendant SHEIDA's involvement in Abreezio, defendant TANEJA emailed the Second SHEIDA Sham Account, thanking "Sheida" for her "breakthrough technology contributions" and volunteering to "look you up if my future travels bring me to BC/Canada";

hh.  On or about January 16, 2018, as part of civil litigation filed by Victim Company against defendants KARIM, SHEIDA, and TANEJA arising out of the Abreezio purchase, defendant KARIM caused to be served

16

on counsel for Victim Company responses to interrogatories which included, in response to the question "Describe your role in the formation, operation, and sale of Abreezio LLC," the false and misleading statements "Mr. Arabi introduced his sister Sheida Alan to his long-time acquaintance Sanjiv Taneja, which introduction ultimately led to the formation of Abreezio, LLC. However, Mr. Arabi otherwise had no role in the formation, operation or sale of Abreezio, LLC."; and

ii. On or about June 22, 2018, defendants KARIM and SHEIDA caused to be produced in civil litigation a copy of a notebook supposedly prepared by defendant SHEIDA and bearing internal dates from September 17, 2012 to December 27, 2013, although in truth many of the notes in the notebook were copied verbatim without attribution from sources published long after the dates reflected in the notebook. All in violation of Title 18, United States Code, Section 1349.

## Counts 2-5

## Wire Fraud

### 18 U.S.C. § 1343

17. Paragraphs 1 through 11 are hereby incorporated by reference as if fully stated herein.

18. Beginning no later than October 2014, and continuing up to and including June 22, 2018, within the Southern District of California and elsewhere, defendants KARIM ARABI ("KARIM"), SHEIDA ALAN, aka Sheida Arabi, ("SHEIDA"), SANJIV TANEJA, and ALI AKBAR SHOKOUHI did knowingly, with the intent to defraud, devise a material scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and intentional concealment and omission of material facts.

1      19.  As part of the scheme to defraud, defendants KARIM, SHEIDA,

2  TANEJA, and SHOKOUHI utilized the Manner and Means described in

3  paragraphs 13 through 16 above, which are hereby realleged and

4  incorporated by reference as if fully stated herein.

5             **Execution of Scheme by Wire Communications**

6      20.  On or about October 30, 2015, within the Southern District of

7  California and elsewhere, defendants KARIM ARABI ("KARIM"), SHEIDA ALAN,

8  aka Sheida Arabi, ("SHEIDA"), SANJIV TANEJA, and ALI AKBAR SHOKOUHI, for

9  the purpose of executing the aforesaid scheme and artifice to defraud,

10  did transmit and cause to be transmitted by wire communications in

11  interstate and foreign commerce, certain writings, signs, signals, and

12  sounds in the form of transfers of money as more particularly described

13  below:

| Count | Defendant | Sending Bank | Recipient/ Receiving Bank | Approx. Amount (USD) |
|---|---|---|---|---|
| 2 | KARIM & SHEIDA | Bank of America | Canadian Imperial Bank of Commerce | $91,854,370.93 |
| 3 | SHOKOUHI | Bank of America | Bank of America Beneficiary: Company 2 | $14,352,245.46 |
| 4 | TANEJA | Bank of America | Bank of America | $10,046,571.82 |
| 5 | SHOKOUHI | Bank of America | Bank of America Beneficiary: Company 3 | $10,046,571.82 |

24  All in violation of Title 18, United States Code, Sections 1343 and 2,

25  and *Pinkerton v. United States,* 328 U.S. 640 (1946).

26  //

27  //

28

1

## Count 6

## Conspiracy to Launder Monetary Instruments

## 18 U.S.C. § 1956(h)

## [KARIM & SHEIDA]

21.   Paragraphs 1 through 11 are hereby incorporated by reference as if fully stated herein.

22.   Beginning on a date unknown to the grand jury but no later than August 21, 2015, and continuing up to and including at least April 1, 2021, in the Southern District of California and elsewhere, defendants KARIM ARABI ("KARIM"), and SHEIDA ALAN, aka Sheida Arabi, ("SHEIDA")did knowingly conspire together and with others known and unknown to the grand jury to commit offenses against the United States in violation of Title 18, United States Code, Sections 1956 and 1957, to wit:

a.   to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, that is, wire fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.   to knowingly engage and attempt to engage in monetary transactions, by, through and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a

specified unlawful activity, that is, wire fraud; in violation of Title 18, United States Code, Section 1957.

23.   It was the purpose of the conspiracy for defendants KARIM and SHEIDA to launder the proceeds of wire fraud, and thereby enrich themselves and their associates.

24.   To accomplish the objectives of the conspiracy, defendants KARIM and SHEIDA used the following manner and means, among others:

a.   Defendant SHEIDA would and did open a dedicated bank account at Canadian Imperial Bank of Commerce ("CIBC") in the name "Sheida Alan" (the "Holding Account") to be used to receive over $91 million in wire fraud proceeds from Victim Company;

b.   Defendant SHEIDA would and did receive approximately $91,854,370.93 (USD) of wire fraud proceeds from Victim Company in the Holding Account;

c.   Within less than three months, defendant SHEIDA would and did empty the Holding Account by transferring its entire balance to another CIBC account and closing the Holding Account the same day;

d.   Defendant SHEIDA would and did form a Canadian real estate investment company, Avante North Ventures, Inc. ("Avante"), to further conceal and distribute the proceeds of wire fraud, including by investing them in valuable real estate in British Columbia;

e.   Defendant SHEIDA would and did transfer $4 million from Avante to a company controlled by defendant KARIM and later justify the transfer as a business-to-business loan under a supposed promissory note requiring no repayments for a period of up to five years;

f.   Defendant SHEIDA would and did coordinate with defendant KARIM about the purchase, carrying, and disposition of real estate, including by email;

g.   In consultation with defendant KARIM, defendant SHEIDA would and did purchase multiple parcels of Canadian real estate worth tens of millions of Canadian dollars;

h.   In consultation with defendant KARIM, defendant SHEIDA would and did liquidate certain pieces of real property to provide partial repayment to Victim Company as part of defendants KARIM and SHEIDA's civil settlement with Victim Company from a civil lawsuit Victim Company filed against defendants KARIM and SHEIDA arising out of the Abreezio transaction.

All in violation of Title 18, United States Code, Section 1956(h).

## Count 7

### Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity

### 18 U.S.C. § 1957

### [TANEJA]

25.   Paragraphs 1 through 11 are hereby incorporated by reference as if fully stated herein.

26.   On or about July 19, 2018, within the Southern District of California and elsewhere, defendant SANJIV TANEJA did knowingly engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000.00, to wit: a wire transfer in the amount of $1,550,679.70 sent from Ally Bank account ending in x8694 to Ally Bank account ending in x4404, such property having been derived from specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, in which defendant TANEJA

1  participated in the transfer of the proceeds from the Southern District
2  of California to another district.

3  All in violation of Title 18, United States Code, Section 1957.

4  **Count 8**

5  **Engaging in Monetary Transactions in Property Derived From**

6  **Specified Unlawful Activity**

7  **18 U.S.C. § 1957**

8  **[SHOKOUHI]**

9  27.  Paragraphs 1 through 11 are hereby incorporated by reference
10  as if fully stated herein.

11  28.  On or about May 31, 2017, within the Southern District of
12  California, defendant ALI AKBAR SHOKOUHI did knowingly engage in a
13  monetary transaction by, through, and to a financial institution,
14  affecting interstate and foreign commerce, in criminally derived
15  property of a value greater than $10,000.00 and which was derived from
16  specified unlawful activity, that is, wire fraud in violation of Title
17  18, United States Code, Section 1343, to wit: a sale of 10,000 shares
18  of stock (stock symbol LXRX) held by E*TRADE account ending in '0394 for
19  $136,008.08.

20  All in violation of Title 18, United States Code, Section 1957.

21  **CRIMINAL FORFEITURE**

22  29.  The allegations contained in Counts 1 through 8 of this
23  Indictment are hereby realleged and incorporated by reference for the
24  purpose of alleging forfeiture to the United States pursuant to Title
25  18, United States Code, Sections 981(a)(1)(C), 982(a)(1), and 982(b),
26  and Title 28, United States Code, Section 2461(c).

27  30.  Upon conviction of one and more of the offenses in violation
28  of Title 18, United States Code, Sections 1349 and 1341 set forth in

Counts 1 through 5 of this Indictment, defendants KARIM ARABI ("KARIM"), SHEIDA ALAN, aka "Sheida Arabi," ("SHEIDA"), SANJIV TANEJA, and ALI AKBAR SHOKOUHI shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, which constitutes or is derived from proceeds of the offenses and all property traceable to such property.

31.   Upon conviction of the offense in violation of Title 18, United States Code, Section 1956(h) as set forth in Count 6 defendants KARIM ARABI ("KARIM") and SHEIDA ALAN, aka Sheida Arabi, ("SHEIDA") shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1) all property involved in the offense.  The property to be forfeited includes, but is not limited to: residential real property located at 1520 Vinson Creek Road, West Vancouver, British Columbia, Canada.

32.   Upon conviction of the offense in violation of Title 18, United States Code, Section 1957 as set forth in Count 7 defendant SANJIV TANEJA shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1) all property involved in the offense.

33.   Upon conviction of the offense in violation of Title 18, United States Code, Section 1957 forth in Count 8 defendant ALI AKBAR SHOKOUHI shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1) all property involved in the offense.

34.   If any of the property described above, as a result of any act or omission of the defendants:

     a.   cannot be located upon the exercise of due diligence;

     b.   has been transferred or sold to, or deposited with, a third party;

1

2   c. has been placed beyond the jurisdiction of the court;

3   d. has been substantially diminished in value; or

4   e. has been commingled with other property that cannot be

5 divided without difficulty, the United States of America shall be

6 entitled to forfeiture of substitute property pursuant to Title 18,

7 United States Code, Section 982(b) and Title 28, United States Code,

8 Section 2461(c).

9 All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and

10 982(a)(2)(B), and Title 28, United States Code, Section 2461(c).

11  DATED: May 24, 2022.

12             A TRUE BILL:

13

14

15 RANDY S. GROSSMAN
United States Attorney

16

17 By:

18 NICHOLAS W. PILCHAK
MEGHAN E. HEESCH

19 ERIC R. OLAH
Assistant U.S. Attorneys

20

21

22

23

24

25

26

27

28